UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Monica Buboltz,                                          Civil No. 05-3002 (PAM/JJG)

                        Plaintiff,

v.                                                      **MEMORANDUM AND ORDER**

Residential Advantages Inc.,

                        Defendant.

---

This matter is before the Court on Defendant Residential Advantages Inc.'s Motion for Summary Judgment. For the reasons that follow, the Court grants the Motion.

**BACKGROUND**

**A.      Residential Advantages**

Defendant Residential Advantages provides residential services for six severely disabled women in New Ulm, Minnesota. The residents suffer from a variety of physical and mental disabilities, including mental retardation, Down's Syndrome, seizures, and blindness. Residential Advantages provides constant medical care, supervision, and support to the residents. Its services include assistance with dressing, grooming, personal hygiene, bathing, eating, food preparation, laundry, cleaning, medication administration, and transportation. Residential Advantages employs direct service professionals (DSP) to provide these services. The DSP job summary lists seventeen essential functions, including ensuring the resident's medical and nutritional needs are met.[1]

---

[1] Other essential functions include providing direct support for all residents, assuring quality service for all residents, assisting residents in meeting personal and physical needs, assisting residents in selecting and participating in at-home and community recreational activities, and assisting the resident in maintaining a household.

Residential Advantages also contracts with a related organization to provide quality assurance monitoring through individuals known as lifestyle specialists. These specialists visit the facility regularly to audit for compliance with the minimum standards established by licensing entities,[2] as well as to provide suggestions for improving the quality of care and satisfaction of the residents.

## B.    Monica Buboltz

Plaintiff Monica Buboltz applied for a DSP position with Residential Advantages in December 1999. At that time, Residential Advantages knew that Buboltz was legally blind and waived the job requirement of driving. When hired, Buboltz informed Residential Advantages that she could not work weekends.

As a part-time employee, Buboltz generally worked 3:00 p.m. to 8:00 p.m. one or two afternoons per week. She always worked with at least one other staff member, and usually two or three other staff members.[3] However, she spent one-on-one time with individual residents, providing direct care. At no time during her employment did residents under her supervision suffer harm because of her actions.

Between April 2000 and January 2005, Buboltz dispensed approximately 790 medications to the residents. This averages to her administering medication approximately

---

[2] Both the Minnesota Department of Human Services and the Minnesota Department of Health regulate the facility.

[3] For example, from April 1, 2004 to August 1, 2005, Buboltz was scheduled to work a total of ninety-one shifts. For seventy-three of the shifts, she was scheduled as one of a team of three or four staff members. For sixteen of the shifts, she was scheduled as part of a team of three for most of the shift, with a few hours as part of a team of two. For two of the shifts, she was scheduled as part of a team of only two staff members. (Galvin Aff. ¶ 21.)

twice per month.  The task took between fifteen and forty-five minutes to complete.  Buboltz dispensed medication with the aid of a magnifier and generally performed the duty without problem.  Over the course of her employment, she had two minor medication administration incidents.[4]  However, no resident was ever harmed due to these errors.

### C.   Lifestyle Specialist Audit

In December 2004, Lifestyle Specialist Laure Verdoes conducted an onsite audit of the facility.  Based on her observations, Verdoes expressed concern as to whether Buboltz's vision impairment precluded her from providing adequate care and supervision to residents.  Verdoes cited specific examples that caused her concern.  For example, she observed Buboltz holding a document upside down while seemingly reviewing it and noted that another staff member had to point out to Buboltz that the document was upside down.  She also observed Buboltz feeling around a table for another document when Verdoes was holding the document in her hand.  Based on these observations, Verdoes questioned Buboltz's ability to read medication and food labels.  (Verdoes Aff. ¶ 4.)

Verdoes also expressed apprehension that Buboltz was unable to pick up on visual cues relating to the health and safety of the residents.  For example, Verdoes observed Buboltz touch the groin area of a resident to determine if the resident had suffered incontinence.  Verdoes was troubled that Buboltz's inability to visually detect the incontinence would cause the resident to experience discomfort and humiliation, as well as

---

[4] One related to a failure to record her administration of a multi-vitamin.  The other involved Buboltz and another staff member dispensing a medication three hours after it was supposed to have been dispensed.

lose an opportunity to work on preventing the problem.  (Id. ¶ 7.)  Verdoes was also concerned that Buboltz was unable to pick up on visual cues that precede some of the residents' seizures, thereby preventing injury.  (Id. ¶ 3.)

### D.      Changes in Work

After Verdoes raised her concerns, Supervisor Sharon Leppla assured Verdoes that Residential Advantages used Buboltz in a manner that did not compromise the safety or opportunity of the residents.  Notwithstanding those assurances, Leppla decided in February 2005 that Buboltz should no longer dispense medication or work alone with residents.  Soon thereafter, Leppla also informed all DSPs that staffing issues required each to work every other weekend.  The weekend-shift requirement meant that Buboltz would be scheduled to work every other Saturday and Sunday from 11:00 a.m. to 7:00 p.m., thereby significantly increasing her work schedule.  When Leppla announced the requirement, Buboltz was the only employee who was not already working weekends.  Buboltz maintained that the policy did not apply to her.

Buboltz wrote a letter to Leppla in response to the changes.  In March 2005, Buboltz met with Leppla and Human Resource Generalist Cathy Galvin to discuss the changes.  The managers informed Buboltz that the weekend-work policy applied to her, despite the agreement made when Buboltz was hired that she would not work weekends and that Buboltz had not worked any weekend in the preceding five years of employment.

The managers also discussed the two limitations imposed on Buboltz.  When Buboltz inquired as to the reasons for the restrictions, they explained that others had observed

limitations on Buboltz's ability to perform visual assessments of the residents.  They did not identify a specific problem or incident arising from Buboltz dispensing medication or providing one-on-one care to a resident.  Instead, they explained that the limitations were imposed as a precautionary measure.  They specified that they were concerned that a state licensing department would question Buboltz's ability to dispense medication accurately, and that they wanted to reduce the risk of Buboltz being involved in a vulnerable adult report. When Buboltz expressed displeasure about the restrictions, the managers responded that the changes were minor.  Despite her dissatisfaction with the changes, Buboltz did not file a grievance in accordance with company policy.[5]

Residential Advantages began scheduling Buboltz for weekend shifts on March 25, 2005.  Following Buboltz's shift during a weekend in June 2005, Leppla received a written complaint from a DSP who had worked with Buboltz.  The coworker stated that Buboltz failed to perform many of her assigned tasks, commenting that "she does not pull her own weight and just lets everyone else do everything.  It isn't fair to any of us."  (Galvin Aff. Ex. C1.)

Leppla issued a performance report concerning Buboltz's behavior during that weekend.  Buboltz maintains that the issues reported were inaccurate, and she provided Leppla with additional documentation to supplement her file.  Thereafter, Buboltz did not report to work and instead used sick leave or paid time off to cover her shifts.  Buboltz maintains that Residential Advantages treated her negatively for using paid time off and

---

[5] The company grievance policy requires an employee to submit a grievance to his or her supervisor within five days of the adverse employment decision.

considered it a poor reflection on her motivation to work.   She submitted a letter of

resignation in late July 2005, effective August 1, 2005.

**DISCUSSION**

Buboltz asserts both disparate treatment and failure to accommodate claims under

both the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation

Act, 29 U.S.C. § 794.  Courts apply the same analysis to interpret these statutes.  Wojewski

v. Rapid City Reg. Hosp., Inc., 450 F.3d 338, 344 (8th Cir. 2006) (citations omitted).[6]

**A.     Standard of Review**

Summary judgment is proper when the evidence viewed in a light most favorable to

the nonmoving party demonstrates that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  Thus, only disputes of facts that might affect the outcome of the

suit under the governing substantive law will preclude summary judgment.  Id.  The moving

party bears the burden of showing that there are no genuine issues of material fact and that

the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).  The nonmoving party is entitled to all inferences that

may be reasonably drawn from the underlying facts in the record.  Meriwether v. Caraustar

Packaging Co., 326 F.3d 990, 992-93 (8th Cir. 2003).  However, the nonmoving party may

---

[6] There are two differences between the ADA and the Rehabilitation Act.  First, the
Rehabilitation Act requires a plaintiff to show that he or she was denied the benefits of a
program or activity of a public entity that receives federal funds, while the ADA has no
federal funding requirement.  Wojewski, 450 F.3d at 344.  Second, the Rehabilitation Act
imposes a requirement that the plaintiff's disability serve as the sole impetus for an adverse
action.  Id.  Neither of these differences is at issue in this case.

not merely rest upon allegations or denials in its pleadings—it must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 256.

Because employment discrimination cases often turn on inferences rather than direct evidence, the Court is particularly deferential to the party opposing summary judgment in employment discrimination cases. <u>Peterson v. Scott County</u>, 406 F.3d 515, 520 (8th Cir. 2005) (citations omitted).

**B.      Disparate Treatment**

The parties agree that the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973) applies to the disparate treatment claims. <u>See</u> <u>EEOC v. Wal-Mart Stores, Inc.</u>, 477 F.3d 561, 568 (8th Cir. 2007) (<u>McDonnell Douglas</u> analysis applies when no direct evidence of discrimination exists). Under that paradigm, Buboltz must first establish a prima facie case of discrimination by showing: (1) she was disabled; (2) she was qualified to do the essential job functions (with or without reasonable accommodation); and (3) she suffered an adverse action due to her disability. <u>Id.</u> If Buboltz establishes a prima facie case, Residential Advantages must then proffer a legitimate, nondiscriminatory reason for the action. <u>Id.</u> at 570. Ultimately, Buboltz must show that the proffered reason is a pretext for discrimination. <u>Id.</u>

The parties dispute only one element of the prima facie case: whether Residential Advantages took adverse action against Buboltz because of her blindness. Buboltz contends that Residential Advantages took several adverse actions against her: (1) it eliminated the essential functions

7

of her job; (2) it more than doubled the amount of hours it required her to work; and (3) it constructively discharged her.

An employee suffers an adverse employment action when there is a "tangible change in duties or working conditions" constituting "a material employment disadvantage." Burchett v. Target Corp., 340 F.3d 510, 518 (8th Cir. 2003) (citation omitted); Enowmbitang v. Seagate Tech., Inc., 148 F.3d 970, 973 (8th Cir. 1998) (adverse employment action must materially alter or impact the terms of the plaintiff's employment).[7]

> The adverse employment action must be one that produces a material employment disadvantage. Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge. Minor changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action, however.

---

[7] The United States Supreme Court recently explained what constitutes an adverse employment action under Title VII's anti-retaliation provision. Burlington No. & Sante Fe v. White, 126 S. Ct. 2405 (2006). In doing so, the Supreme Court distinguished the anti-retaliation provision from the anti-discrimination provision on the ground that the text of the former is not limited to actions affecting employment terms and conditions. Id. at 2410-14. Thus, the Supreme Court held that the anti-retaliation provision extends beyond actions and harms that relate or occur at the workplace. Id. In so holding, the Supreme Court abrogated Manning v. Metropolitan Life Insurance Co., 127 F.3d 686, 692 (8th 1997) (requiring evidence of a tangible change in duties or working conditions that constitute a material employment disadvantage). 126 S. Ct. at 2410-14. However, the Supreme Court also held that the anti-retaliation provision covers only actions that a reasonable employee would consider materially adverse. Id. at 2415.

Prior to Burlington Northern, courts interchanged definitions of what constituted an adverse employment action under both the anti-discrimination provision and the anti-retaliation provision. Burlington Northern forecloses this practice. However, because Burlington Northern addresses only the anti-retaliation provision, it does not apply to this case.

Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999).  Thus, the action must be more than a minor change in employment conditions.  Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997).

    1.   Medication Administration

The parties dispute whether restricting Buboltz from distributing medication to residents was an adverse employment action.  "Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case."  Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to position that involved fewer secretarial duties and was more stressful was nothing "more disruptive than a mere inconvenience or an alteration of job responsibilities.") (citation omitted).  However, the removal of most of an employee's major responsibilities is an adverse employment action.  Hervey v. County of Koochiching, No. 04-4537, 2006 WL 2990515, at *11 (D. Minn. Oct. 20, 2006) (Schiltz, J.).

The parties present statistics to bolster their respective positions on the issue of whether the administration of medication was a major job responsibility.  Residential Advantages calculates that Buboltz spent less than 2.5% of her working time administering medication.  Buboltz responds that she dispensed medication approximately 790 times between April 2000 and January 2005.  She also notes that other DSPs believed that administering medication was an important job function.  (Miller-Van Oort Supp. Aff. Ex. 32 (Nelson Dep.) at 22; id. Ex. 33 (Grosam Dep.) at 15.)  Finally, she relies on the DSP job description, which identifies an essential function as "meeting the client's medical and

nutritional needs."

Administering medication clearly is an important task that ensures the health and safety of the residents. However, Buboltz did not spend much time completing the task. Moreover, the essential job function of meeting the medical and nutritional needs of the residents encompasses significantly more than administering medication. Finally, it is undisputed that the elimination of the duty did not result in a diminution of title or a reduction in pay or benefits. Accordingly, restricting Buboltz from administering medication was not an adverse employment action.

2.   <u>Working Alone</u>

Buboltz submits that restricting her from working alone with residents was an adverse employment action for two reasons. First, she contends that the restriction prohibited her from providing much of the direct care that she previously provided to residents. Second, she maintains that the restriction fostered negative feelings towards Buboltz by her coworkers.

However, Buboltz concedes that the restriction was not problematic if the facility was triple- staffed. Both before and after the restriction, most of her shifts were triple-staffed. Moreover, although Residential Advantages restricted her from providing unaccompanied care to residents, Buboltz has not cited any specific instances in which she was prevented from doing an activity with the residents. Thus, there is no evidence that the restriction actually prevented her from performing a specific job responsibility or that it resulted in a diminution of title or a reduction in pay or benefits. Likewise, there is no evidence that the

coworker hostility was either pervasive or severe.  Thus, the restriction does not rise to the level of an adverse employment action.

### 3.   Weekend-Work Requirement

It is undisputed that the weekend-work requirement significantly increased the hours Buboltz was scheduled to work.  Buboltz relies on several decisions to argue that the requirement was an adverse employment action.[8]  First, she notes that the United States Supreme Court recently recognized that a scheduling change may constitute an adverse employment action.  See Burlington No. & Sante Fe v. White, 126 S. Ct. 2405, 2415 (2006) ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.").  However, Buboltz places too much weight on this dicta.  The Supreme Court did not hold that an unsatisfactory scheduling change constituted an adverse employment action.  Rather, it merely explained that "context matters" and instructed courts to consider the whole picture when determining whether the employment decision rises to the level of an adverse employment action.  Id. (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998) ("The real societal impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.")).

---

[8] In the Complaint, Buboltz alleges that Residential Advantages discriminated against her by "severely restricting" her shifts and hours.  (Compl. ¶¶ 30, 35.)  However, Buboltz now argues that Residential Advantages discriminated against her by forcing her to increase her hours.  For the purposes of this Motion, the Court assumes that Buboltz would move to amend the Complaint to conform with the evidence.  See Fed. R. Civ. P. 15(b).

Buboltz also relies on Casas v. Gonzales, No. 04-5296, 2006 WL 2794955 (N.D. Ill. Sept. 28, 2006), where the court stated: "Certainly, a work increase of the magnitude plaintiff alleges, two to three hours a day, can be an adverse employment action under certain circumstances." Id. at *6. However, Casas does not help Buboltz for several reasons. First, the Casas court relied on Minor v. Centocor, Inc., 457 F.3d 632, 634 (7th Cir. 2006), which held that requiring a plaintiff to work twenty-five percent more to earn the same income was the functional equivalent to a twenty-percent reduction in pay and therefore a materially adverse change in the terms of employment. The Casas court distinguished Minor on the ground that Casas received compensatory time for the extra hours she worked. 2006 WL 2794955, at *6. The same is true here, as there is no evidence that Residential Advantages did not pay Buboltz for the extra hours. Second, the Casas court expressly refused to determine whether the extra work constituted an adverse employment action. Id. Thus, Casas is inapposite. Moreover, the Eighth Circuit Court of Appeals has indicated that requiring an employee to work additional hours is not an adverse employment action. See Hughes v. Stottlemyer, 454 F.3d 791, 797 (8th Cir. 2006) (in 42 U.S.C. § 1983 retaliation claim, rejecting argument that the plaintiff suffered a materially significant disadvantage by having to work more Sundays and Wednesdays).

In this case, Residential Advantages implemented a uniform policy that required all DSPs to work every other weekend. Although Residential Advantages required Buboltz to work more hours than she had previously worked, it merely held Buboltz to the same standard as her coworkers. Because the policy did not cause Buboltz a significant or material

disadvantage in the terms and conditions of her employment, the weekend-work requirement was not an adverse employment action.

Finally, even if the weekend-work requirement was an adverse employment action, Buboltz fails to present any evidence linking the requirement to discriminatory intent.  "An adverse employment action by itself is not sufficient for a successful claim under the ADA. Instead, there must be a specific link between the discrimination and the adverse action to prove that the discrimination motivated the adverse action." Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 991-92 (8th Cir. 2007) (citation omitted).  Undisputed evidence shows that Residential Advantages experienced a twenty-percent reduction in staff when it implemented the weekend-work requirement.  Buboltz contends that the reduction was not significant and that Residential Advantages focused on her because she was the only person who previously did not work weekends.  However, there is no evidence that Residential Advantages required Buboltz to work every other weekend because of her visual impairment or that her impairment inhibited her from working weekends.  Consequently, Buboltz fails to show that Residential Advantages implemented the weekend-work requirement because of her vision impairment.

4.   Constructive Discharge

Buboltz claims that Residential Advantages constructively discharged her by: (1) banning her from administering medication without first exploring possible reasonable accommodations, (2) thwarting discussions regarding possible reasonable accommodations, (3) humiliating Buboltz by requiring her to inform coworkers that she was not to dispense medication, (4) forbidding Buboltz from working alone with residents, (5) increasing her work schedule by requiring her to work weekends, and (6) fostering negative feelings among coworkers toward Buboltz.

> Just like any other discharge, a constructive discharge is an adverse employment action.  A constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.  Under the objective standard applicable to constructive discharge claims, an employee may not be unreasonably sensitive to his working environment.  A constructive discharge takes place only when a reasonable person would find working conditions intolerable.

Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 825 (8th Cir. 2006) (internal quotations, citations, and brackets omitted).

The evidence viewed in a light most favorable to Buboltz does not show that Residential Advantages constructively discharged Buboltz.  Although Buboltz viewed the conditions under which she worked as unfair and displeasing, her work environment was not so intolerable as to compel a reasonable person to resign.  Indeed, Buboltz worked under the purportedly intolerable conditions for several months and resigned only after receiving a performance report.  Accordingly, the discrimination claim based on constructive discharge fails as a matter of law.

**B.      Failure to Accommodate**

Buboltz alleges that Residential Advantages violated the ADA and the Rehabilitation Act by failing to accommodate her disability.  Failing make a reasonable accommodation for a disabled employee is a separate form of prohibited discrimination under both the ADA and Rehabilitation Act.  Peebles v. Potter, 354 F.3d 761, 766-67 (8th Cir. 2004); Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002).

An employer must engage in an interactive process to identify potential accommodations that could overcome a disabled employee's limitations.  Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 902 (8th Cir. 2006) (citation omitted). The failure to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith.  Id. (citation omitted).  To establish that Residential Advantages failed to engage in an interactive process, Buboltz must show that (1) she was disabled, (2) she requested accommodations; (3) Residential Advantages did not assist her in making accommodations; and (4) she could have been reasonably accommodated but for Residential Advantages's lack of good faith.  Id.

Buboltz contends that Residential Advantages ignored her requests for accommodations.  In particular, at the March 2005 meeting Buboltz stated that there were numerous devices that she could use to aid in the administration of medication.  However, Leppla and Galvin did not discuss the devices and merely responded that another employee would complete the task.  It is undisputed that other accommodations were available.

Nonetheless, an employer is not obligated to provide the accommodation requested or preferred by the employee.  Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1019 (8th Cir. 2000); see also Equal Employment Opportunity Commission Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, 1999 WL 33305876, at *9 (Mar. 1, 1999) ("the employer providing the accommodation has the ultimate discretion to choose between effective accommodations."). The accommodation need only be a reasonable accommodation, and job restructuring is one of the many alternative accommodations that an employer may offer.  42 U.S.C. § 12111(9).  Further, although an employer need not eliminate an essential job function as a reasonable accommodation, it certainly may voluntarily do so.  Equal Employment Opportunity Commission Enforcement Guidance, 1999 WL 33305876, at *2.

Residential Advantages offered to accommodate Buboltz by eliminating some of her job responsibilities.  Although Buboltz was dissatisfied with the restructuring option, Residential Advantages satisfied its duty to reasonably accommodate Buboltz.

**CONCLUSION**

Viewing the evidence in a light most favorable to Buboltz, the Court concludes that Residential Advantages did not discriminate against Buboltz because of her vision impairment or fail to accommodate her.  Accordingly, **IT IS HEREBY ORDERED** that:

1.   Residential Advantages's Motion for Summary Judgment (Docket No. 33) is **GRANTED**;

2.      Buboltz's Motion for Summary Judgment (Docket No. 75) is **DENIED as**

**moot**; and

3.      Buboltz's Motion for Leave to File Amended Complaint (Docket No. 81) is

**DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March 27, 2007

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge